**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA, | No. 19-17213 |
| *Plaintiffs-Appellees,* | D.C. No. 4:19-cv-04717-PJH |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency; U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security; TRACY RENAUD, in her official capacity as Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services, | |
| *Defendants-Appellants,* | |
| STATES OF ARIZONA, ALABAMA, ARKANSAS, INDIANA, KANSAS, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, OKLAHOMA, SOUTH CAROLINA, TEXAS, AND WEST VIRGINIA, | |
| *Intervenors-Pending.* | |

STATE OF CALIFORNIA; DISTRICT OF
COLUMBIA; STATE OF MAINE;
COMMONWEALTH OF
PENNSYLVANIA; STATE OF OREGON,
                    *Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, a federal agency; UNITED
STATES CITIZENSHIP AND
IMMIGRATION SERVICES, a federal
agency; ALEJANDRO MAYORKAS, in
his official capacity as Secretary of
the U.S. Department of Homeland
Security; TRACY RENAUD, in her
official capacity as Senior Official
Performing the Duties of the
Director, U.S. Citizenship and
Immigration Services,
                    *Defendants-Appellants*,

STATES OF ARIZONA, ALABAMA,
ARKANSAS, INDIANA, KANSAS,
LOUISIANA, MISSISSIPPI, MISSOURI,
MONTANA, OKLAHOMA, SOUTH
CAROLINA, TEXAS, AND WEST
VIRGINIA,
                    *Intervenors-Pending.*

No. 19-17214

D.C. No.
4:19-cv-04975-
PJH

STATE OF WASHINGTON;
COMMONWEALTH OF VIRGINIA;
STATE OF COLORADO; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF MARYLAND;
COMMONWEALTH OF
MASSACHUSETTS; DANA NESSEL,
Attorney General on behalf of the
People of Michigan; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF RHODE
ISLAND; STATE OF HAWAII,
                 *Plaintiffs-Appellees*,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, a federal agency;
ALEJANDRO MAYORKAS, in his
official capacity as Secretary of the
U.S. Department of Homeland
Security; UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICES, a federal agency; TRACY
RENAUD, in her official capacity as
Senior Official Performing the
Duties of the Director, U.S.
Citizenship and Immigration
Services,
                 *Defendants-Appellants*,

No. 19-35914

D.C. No.
4:19-cv-05210-
RMP

ORDER

STATES OF ARIZONA, ALABAMA,
ARKANSAS, INDIANA, KANSAS,
LOUISIANA, MISSISSIPPI, MISSOURI,
MONTANA, OKLAHOMA, SOUTH
CAROLINA, TEXAS, AND WEST
VIRGINIA,
                    *Intervenors-Pending.*

Filed April 8, 2021

Before:  Mary M. Schroeder, William A. Fletcher, and
Lawrence J. VanDyke, Circuit Judges.

Order;
Dissent by Judge VanDyke

---

## SUMMARY[*]

---

### Immigration/Intervention

The panel denied motions by the State of Arizona and other states to intervene in cases in which the panel previously issued an opinion in *City and County of San Francisco v. USCIS*, 981 F.3d 742 (9th Cir. 2020) [Schroeder (author)  W. Fletcher VanDyke (dissenting)], affirming in part and vacating in part preliminary injunctions enjoining implementation of the Department of Homeland Security's redefinition of the term "public charge," and in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

which the Supreme Court on March 9, 2021, dismissed pending petitions for writ of certiorari pursuant to the stipulation of the parties.

Judge VanDyke dissented from the denial of intervention. Judge VanDyke wrote that with the recent change in federal administrations, the Biden Administration stopped defending certain rules promulgated by the Trump Administration, including the Public Charge rule at issue in this case. Judge VanDyke observed that this in itself is neither surprising nor particularly unusual, as elections have consequences, and new presidential administrations, especially of a different party, often disagree with some of the rules promulgated by their predecessors. But here, Judge VanDyke wrote, the new administration did something quite extraordinary with the Public Charge rule: in concert with the various plaintiffs who had challenged the rule in federal courts across the country, the federal defendants simultaneously dismissed all the cases challenging the rule (including cases pending before the Supreme Court), acquiesced in a single judge's nationwide vacatur of the rule, leveraged that now-unopposed vacatur to immediately remove the rule from the Federal Register, and quickly engaged in a cursory rulemaking stating that the federal government was reverting back to the Clinton-era guidance—all without the normal notice and comment typically needed to change rules.

A collection of states moved to intervene in the various lawsuits challenging the rule around the country (including this one), arguing that because the federal government was now demonstrably in cahoots with the plaintiffs, the states should be allowed to take up the mantle of defending the Trump-era rule. Pointing to the fact that the Supreme Court had both stayed multiple lower courts' injunctions of the rule

and—until the new administration voluntarily dismissed its appeals—planned to review the rule's validity, the states contended there was something amuck about the federal government's new rulemaking-by-collusive-acquiescence.

In Judge VanDyke's view, the states easily met the intervention standard of Federal Rule of Civil Procedure 24. First, because the states quickly intervened within days of discovering that the federal government had abandoned their interests, and the federal government asserted no apparent prejudice in allowing intervention, Judge VanDyke wrote that the motion to intervene was timely. Judge VanDyke wrote that the states also have a "significant protectable interest" in the continuing validity of the rule because invalidating the rule could cost the states as much as $1.01 billion annually. Responding to the plaintiffs' and the federal government's argument that in lieu of joining this litigation, the states could vindicate their interests by participating in an agency review process or asking the agency to promulgate a new rule, Judge VanDyke observed that this argument might have had more merit had the federal government followed the traditional route of asking the courts to hold the public charge cases in abeyance, rescinding the rule per the Administrative Procedure Act, and then promulgating a new rule through notice and comment rulemaking. Judge VanDyke wrote that instead, the federal government intentionally avoided the APA entirely by acquiescing in a final district court judgment, and altering the federal regulations by unilaterally reinstating the Clinton-era field guidance as the de facto new rule—without any formal agency rulemaking or meaningful notice to the public. Judge VanDyke wrote that by deliberately evading the administrative process in this way, the government harmed the state intervenors by preventing them from seeking any meaningful relief through agency channels.

Judge VanDyke wrote that the disposition of this action, together with the federal government's other coordinated efforts to eliminate the rule while avoiding APA review, will impair or impede the states' ability to protect their interest in the 2019 rule's estimated annual savings. Judge VanDyke also wrote that the existing parties obviously do not adequately represent the states' interests because they are now united in vigorous opposition to the rule.

Addressing the plaintiffs' and the government's argument that this case is moot because the court cannot offer adequate relief now that the 2019 rule has been vacated by a different federal judge in the Seventh Circuit, Judge VanDyke wrote that the parties opposing intervention had not met their heavy burden of showing that there is not any effective relief that a court can provide. Judge VanDyke noted that the states could obtain effective relief because they currently have an action pending before the Supreme Court asking that Court to order the Seventh Circuit to reverse or stay the vacatur of the rule, and if successful, that would remove any obstacle to the states ultimately getting relief in this court. Judge VanDyke pointed out that if the states are successful in their current request that the Supreme Court stay the Seventh Circuit's vacatur of the rule, the panel's denial of intervention will leave the states with no way to prevent one of the district courts in this circuit from immediately imposing a nationwide preliminary injunction of the rule or, worse, vacating the rule (again).

Judge VanDyke observed that there is a final reason why intervention is especially warranted in this case. Judge VanDyke wrote that by granting two stays (and a later petition for certiorari), the Supreme Court repeatedly indicated that the United States had "made a strong showing that [it was] likely to succeed on the merits" in its defense of

the rule.  Judge VanDyke wrote that absent intervention, the parties' strategic cooperative dismissals preclude those whose interests are no longer represented from pursuing arguments that the Supreme Court has already alluded are meritorious.   Judge VanDyke wrote that even more concerning, the dismissals lock in a final judgment and a handful of presumptively wrong appellate court decisions in multiple circuits, and circumvent the APA by avoiding formal notice-and-comment procedures.

Judge VanDyke suggested a possible solution to this novel problem of a new federal administration deliberately short-circuiting the normal APA process.  Judge VanDyke observed that the Supreme Court obviously could allow the states to intervene in the Seventh Circuit litigation and defend the 2019 rule in place of the federal government.  But Judge VanDyke wrote that there may be a simpler solution here that would not only address what has happened with respect to the Public Charge rule but, perhaps more importantly, would encourage future administrations to change rules—not through collusive capitulation—but via the familiar and required APA rulemaking process Congress created for that purpose.  Judge VanDyke wrote that the Supreme Court could simply clarify that *Munsingwear* vacatur of lower court decisions and judgments is appropriate in this circumstance where the federal government and the plaintiffs jointly mooted litigation by acquiescing in a judgment against the government, which then prevented the normal APA process for removing or replacing a formal rule.

## COUNSEL

Mark Brnovich, Attorney General; Joseph A. Kanefield, Chief Deputy and Chief of Staff; Brunn ("Beau") W. Roysden III, Solicitor General; Drew C. Ensign, Deputy Solicitor General; Robert J. Makar, Assistant Attorney General; Office of the Attorney General, Phoenix, Arizona; Eric S. Schmitt, Attorney General; D. John Sauer, Solicitor General; Michael E. Talent, Deputy Solicitor General; Office of the Attorney General, Jefferson City, Missouri; Steve Marshall, Alabama Attorney General; Leslie Rutledge, Arkansas Attorney General; Theodore E. Rokita, Indiana Attorney General; Derek Schmidt, Kansas Attorney General; Jeff Landry, Louisiana Attorney General; Lynn Fitch, Mississippi Attorney General; Austin Knudsen, Montana Attorney General; Mike Hunter, Oklahoma Attorney General; Alan Wilson, South Carolina Attorney General; Ken Paxton, Texas Attorney General; Patrick Morrisey, West Virginia Attorney General; for Proposed Intervenors States of Arizona, Alabama, Arkansas, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Oklahoma, South Carolina, Texas, and West Virginia.

Matthew Rodriguez, Acting Attorney General; Michael L. Newman, Senior Assistant Attorney General; Cherokee DM Melton, Supervising Deputy Attorney General; Lisa Cisneros, Katherine Lehe, Julia Hamumi Mass, Brenda Ayon Verduzco, and Anna Rich, Deputy Attorneys General; Office of the Attorney General, Oakland, California; for Plaintiff-Appellee State of California.

James R. Williams, County Counsel; Greta S. Hansen, Chief Assistant County Counsel; Laura Trice, Lead Deputy County Counsel; Raphael N. Rajendra, Julia B. Spiegel, H. Luke Edwards, and Hannah Kieschnick, Deputy County

Counsel; Office of the County Counsel, County of Santa Clara, San Jose, California; for Plaintiff-Appellee County of Santa Clara.

Dennis J. Herrera, City Attorney; Jesse C. Smith, Chief Assistant City Attorney; Ronald P. Flynn, Chief Deputy City Attorney; Yvonne R. Mere, Sara J. Eisenberg, and Matthew D. Goldberg, Deputy City Attorneys; Office of the City Attorney, San Francisco, California; for Plaintiff-Appellee City and County of San Francisco.

Karl A. Racine, Attorney General; Loren L. Alikhan, Solicitor General; Office of the Attorney General, Washington, D.C.; for Plaintiff-Appellee District of Columbia.

Aaron M. Frey, Attorney General; Kimberly L. Patwardhan, Assistant Attorney General; Office of the Attorney General, Augusta, Maine; for Plaintiff-Appellee State of Maine.

Robert W. Ferguson, Attorney General; Noah G. Purcell, Solicitor General; Tera M. Heintz, Deputy Solicitor General; Jeffrey T. Sprung and Nathan K. Bays, Assistant Attorneys General; Office of the Attorney General, Seattle, Washington; for Plaintiff-Appellee State of Washington.

Ellen Rosenblum, Attorney General; Benjamin Gutman, Solicitor General; Nicole DeFever and Patricia Garcia Rincon, Assistant Attorneys General; Oregon Department of Justice, Salem, Oregon; for Plaintiff-Appellee State of Oregon.

Mark R. Herring, Attorney General; Michelle S. Kallen and Jessica Merry Samuels, Deputy Solicitors General; Ryan Spreague Hardy and Alice Ann Lloyd, Assistant Attorneys

General; Office of the Attorney General, Richmond, Virginia; for Plaintiff-Appellee Commonwealth of Virginia.

Josh Shapiro, Attorney General; Michael J. Fischer, Chief Deputy Attorney General; Aimee D. Thomson, Deputy Attorney General; Office of the Attorney General, Philadelphia, Pennsylvania; for Plaintiff-Appellee Commonwealth of Pennsylvania.

Phil Weiser, Attorney General; Eric R. Olson, Solicitor General; Office of the Attorney General, Denver, Colorado; for Plaintiff-Appellee State of Colorado.

Kathleen Jennings, Attorney General; Christian Douglas Wright, Director of Impact Litigation; Vanessa L. Kassab, Deputy Attorney General; Delaware Department of Justice, Wilmington, Delaware; for Plaintiff-Appellee State of Delaware.

Kwame Raoul, Attorney General; Liza Roberson-Young, Public Interest Counsel; Office of the Attorney General, Chicago, Illinois; for Plaintiff-Appellee State of Illinois.

Clare E. Connors, Attorney General; Lili A. Young, Deputy Attorney General; Department of the Attorney General, Honolulu, Hawaii; for Plaintiff-Appellee State of Hawaii.

Brian E. Frosh, Attorney General; Jeffrey P. Dunlap, Assisant Attorney General; Office of the Attorney General, Baltimore, Maryland; for Plaintiff-Appellee State of Maryland.

Maura Healey, Attorney General; Abigail B. Taylor, Chief, Civil Rights Division; David Urena, Special Assistant Attorney General; Angela Brooks, Assistant Attorney

General; Office of the Attorney General, Boston, Massachusetts; for Plaintiff-Appellee Commonwealth of Massachusetts.

Dana Nessel, Attorney General; Fadwa A. Hammoud, Solicitor General; Toni L. Harris, First Assistant Attorney General; Michigan Department of the Attorney General, Lansing, Michigan; for Plaintiffs-Appellees People of Michigan.

Keith Ellison, Attorney General; R.J. Detrick, Assistant Attorney General; Office of the Attorney General, St. Paul, Minnesota; for Plaintiff-Appellee State of Minnesota.

Aaron D. Ford, Attorney General; Heidi Parry Stern, Solicitor General; Office of the Attorney General, Las Vegas, Nevada; for Plaintiff-Appellee State of Nevada.

Burbir S. Grewal, Attorney General; Maria Soueid, Deputy Attorney General; Office of the Attorney General, Trenton, New Jersey; for Plaintiff-Appellee State of New Jersey.

Hector Balderas, Attorney General; Tania Maestas, Chief Deputy Attorney General; Office of the Attorney General, Santa Fe, New Mexico; for Plaintiff-Appellee State of New Mexico.

Peter F. Neronha, Attorney General; Lauren E. Hill, Special Assistant Attorney General; Office of the Attorney General, Providence, Rhode Island; for Plaintiff-Appellee State of Rhode Island.

**ORDER**

The Motion of State of South Carolina to Join Motion to Intervene by the States of Arizona, et al., is **GRANTED.**

The Motion of State of Missouri to Join Motion to Intervene by the States of Arizona, et al., is **GRANTED.**

The Motion to Intervene by the States of Arizona, et al., is **DENIED.**

---

VANDYKE, Circuit Judge, dissenting from the denial of intervention:

With the recent change in federal administrations, the Biden Administration stopped defending certain rules promulgated by the Trump Administration, including the Public Charge rule at issue in this case. That in itself is neither surprising nor particularly unusual. Elections have consequences, as they say, and a common enough one is that new presidential administrations, especially of a different party, often disagree with some of the rules promulgated by their predecessors. But here, as I explain in more detail below, the new administration did something quite extraordinary with the Public Charge rule. In concert with the various plaintiffs who had challenged the rule in federal courts across the country, the federal defendants simultaneously dismissed all the cases challenging the rule (including cases pending before the Supreme Court), acquiesced in a single judge's nationwide vacatur of the rule, leveraged that now-unopposed vacatur to immediately remove the rule from the Federal Register, and quickly engaged in a cursory rulemaking stating that the federal government was reverting back to the Clinton-era

guidance—all without the normal notice and comment typically needed to change rules.

In short, the new administration didn't just stop defending the prior administration's rule and ask the courts to stay the legal challenges while it promulgated a new rule through the ordinary (and invariably time- and resource-consuming) process envisioned by the APA. Instead, together with the plaintiffs challenging the rule, it implemented a plan to instantly terminate the rule with extreme prejudice—ensuring not only that the rule was gone faster than toilet paper in a pandemic, but that it could effectively never, ever be resurrected, even by a future administration. All while avoiding the normal messy public participation generally required to change a federal rule. Not bad for a day's work.

But not everyone was impressed with this rare display of governmental efficiency. Swiftly rebounding from the whiplash, a collection of states quickly moved to intervene in the various lawsuits challenging the rule around the country (including this one), arguing that because the federal government was now demonstrably in cahoots with the plaintiffs, the states should be allowed to take up the mantle of defending the Trump-era rule. Pointing to the fact that the Supreme Court had both stayed multiple lower courts' injunctions of the rule *and*—until the new administration voluntarily dismissed its appeals—planned to review the rule's validity, the states contended there is something amuck about the federal government's new rulemaking-by-collusive-acquiescence.

The panel majority denies the states' motion for intervention. I conclude intervention is warranted, and therefore respectfully dissent. Before explaining why, I first provide some background on the Public Charge rule and the

legal challenges to it. And after explaining why we should have granted intervention, I briefly conclude with what I think might be a possible solution to this novel problem of a new federal administration deliberately (1) short-circuiting the normal APA process by using a single judge to engage in de facto nationwide rulemaking and (2) locking in adverse legal precedents that the Supreme Court has already signaled are highly questionable.

## I. Background

### A. The term "Public Charge"

The term "public charge" has been a part of our country's statutory immigration lexicon for more than a century. *City & County of San Francisco v. USCIS*, 981 F.3d 742, 749 (9th Cir. 2020) (noting the first use in the Immigration Act of 1882). The most recent regulatory interpretation of that term has prompted various circuits across the nation to spill much ink arguing over its precise historical contours. *See, e.g.*, *Cook County v. Wolf*, 962 F.3d 208, 222–29 (7th Cir. 2020); *New York v. U.S. Dep't of Homeland Security*, 969 F.3d 42, 63–80 (2d Cir. 2020); *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 230–34 (4th Cir. 2020), *vacated for reh'g en banc*, 981 F.3d 311 (4th Cir. 2020) (dismissed Mar. 11, 2021); *City & County of San Francisco*, 981 F.3d at 756–58. Throughout much of its history, however, "public charge" has maintained a less-than-precise meaning, even as the term was continuously used in various state and federal statutes denying admission or adjustment of immigration status to noncitizens that were "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A); *see also Cook County*, 962 F.3d at 238–42 (Barrett, J., dissenting) (explaining the statutory usages and inferred meanings of the term "public charge" throughout its history).

In a laudable attempt to give the term a more concrete meaning, the Clinton Administration proposed a rule to define the term "public charge," but the effort was ultimately abandoned and a final rule never issued. *See* Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (proposed May 26, 1999). Enduring from that attempt, however, was field guidance defining a "public charge." Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,692 (May 26, 1999). This field guidance was not binding, but the Department of Homeland Security (DHS) followed it in the absence of explicit regulatory direction. *See New York*, 969 F.3d at 53.

Under the guidance, an individual was considered a "public charge" if he was likely to receive "[c]ash assistance for income maintenance [or] institutionalization for long-term care at government expense." 64 Fed. Reg. at 28,692. But an individual seeking adjustment of status would *not* be considered a "public charge," even though he would need government-provided housing, government-paid electrical assistance, government-provided food, government health insurance for himself and his children, *and* government-provided childcare while using government-provided job training. *See* 64 Fed. Reg. at 28,692–93. In short, under the de facto rule in existence before the Trump Administration promulgated an actual rule, a noncitizen would *not* be deemed a public charge even though the government furnished essentially his every need (and many of his wants), just as long as the government didn't give him *cash* benefits that he could then use to pay for his Netflix subscription.

While the ambiguous concept of a "public charge" no doubt allows for substantial interpretive elasticity, that seems quite a stretch. Indeed, it seems exactly backwards

from what most people would think makes someone a "public charge." Nowadays, almost everybody in this country is getting cash stimulus payments from the IRS on what feels like a semi-regular basis, and nobody thinks that alone makes them a public charge. Call me crazy, but I expect most people would say it is being overly reliant on the government to meet your needs that makes one a public charge, not whether the welfare benefits are provided in cash or in kind.

### B. New Public Charge Definition

Nearly two decades after the Clinton Administration promulgated its guidance, the Trump Administration in August 2019 issued a final rule—after notice and comment—defining "public charge." Inadmissibility on Public Charge Grounds; Final Rule, 84 Fed. Reg. 41,292 (Aug. 14, 2019). The 2019 rule looked prospectively at applications for admission or adjustment of status to determine whether the individual was "more likely than not at any time in the future to receive one or more designated public benefits for more than 12 months in the aggregate within any 36-month period." *Id.* at 41,295. The rule considered whether an individual would likely receive cash from the government and/or "means-tested non-cash benefits . . . which bear directly on the recipient's self-sufficiency and . . . account for significant federal expenditures on low-income individuals." *Id.* at 41,296. If, under the totality of circumstances analysis, a noncitizen applying for admission or adjustment of status would likely need specified cash benefits and/or various non-monetizable government-provided housing, food assistance, or medical insurance for more than a collective twelve months, then the noncitizen could be considered a public charge. *Id.* at 41,501 (citing 8 C.F.R. § 212.21).

Because many categories of immigrants are either not eligible for these types of public benefits or are exempted from the public charge exclusion, the rule primarily affected only a limited subset of immigrants—nonimmigrant visa holders applying for green cards. *See Cook County*, 962 F.3d at 235–38 (Barrett, J., dissenting).[1]  While not currently eligible for public benefits, upon adjustment of status, those individuals would be eligible in the future—thus, "[t]he public charge rule is concerned with what use a green card applicant would make of this future eligibility." *Id.* at 237.

## C.  Challenging the 2019 Public Charge Rule

Notwithstanding that the 2019 rule affected only a narrow group of people, almost none of whom have previously used public benefits, a score of outraged entities challenged the rule.[2]  In late 2019, district courts in the Second, Fourth, Seventh, and Ninth Circuits all preliminarily enjoined the rule's enforcement. *See New York*

---

[1] A lawful permanent resident—already admitted to the U.S. and thus eligible for select public benefits—could also be subject to the 2019 rule if the individual left the United States for more than 180 days, which would bring his residency into question and prompt the need to seek admission upon returning. *See Cook County*, 962 F.3d at 236 (Barrett, J., dissenting).

[2] The states challenging the rule alleged injury in the form of resident noncitizens, confused by the language of the rule, unnecessarily disenrolling from state public benefits. *See New York*, 969 F.3d at 59–60.  DHS explained that the new rule would actually save the states money because they would be paying out less in public benefits. *Id.* at 60.  The challenging states didn't disagree that the rule would directly save them money, but countered with a response that would delight salespeople everywhere: sometimes you have to spend money to save it. *Id.*; *see also City & County of San Francisco*, 981 F.3d at 755.

*v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 353 (S.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 788 (D. Md. 2019); *Cook County v. McAleenan*, 417 F. Supp. 3d 1008, 1014 (N.D. Ill. 2019); *City & County of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1073 (N.D. Cal. 2019); *Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1224 (E.D. Wash. 2019). A divided motions panel of this court stayed the injunctions issued in this circuit in a published opinion, thereby allowing the rule to go into effect. *City & County of San Francisco v. USCIS*, 944 F.3d 773, 781 (9th Cir. 2019). Likewise, the Fourth Circuit stayed the preliminary injunction in its circuit. *CASA de Md., Inc.*, 971 F.3d at 237. The Second and Seventh Circuits initially denied stays, but the Supreme Court stepped in and stayed the preliminary injunctions issued in those circuits as well. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599 (2020); *Wolf v. Cook County*, 140 S. Ct. 681, 681 (2020). In sum, although the plaintiffs had a nice run of initial successes challenging the rule, by early 2020, all the injunctions against the rule had been stayed and the rule was in effect nationwide.

Undeterred by the Supreme Court's signal that challenges to the rule were ultimately likely to fail on the merits, lower courts continued to hammer away. The Second Circuit in continuing litigation affirmed the issuance of its circuit's preliminary injunction (with a limited scope), as did divided panels in the Seventh Circuit and this circuit. *See New York*, 969 F.3d at 50 (affirming the preliminary injunction, but with a limited scope); *Cook County*, 962 F.3d at 215; *City & County of San Francisco*, 981 F.3d at 763 (affirming preliminary injunctions, but with a limited scope). But a divided Fourth Circuit panel reversed, noting that the Supreme Court's stay in other circuits' proceedings "would have been improbable if not impossible had the government,

as the stay applicant, not made a strong showing that it was likely to succeed on the merits." *CASA de Md., Inc.*, 971 F.3d at 229 (citation and internal quotation marks omitted).

Meanwhile, back in the Seventh Circuit, having moved on from the preliminary injunction stage to the merits phase of litigation, the Northern District of Illinois on November 2, 2020 entered a Rule 54(b) final judgment against the federal government and vacated the rule in its entirety. *Cook County v. Wolf*, No. 1:19-cv-06334, 2020 WL 6393005, at *6–7 (N.D. Ill. Nov. 2, 2020). Notwithstanding the Supreme Court's stay of its earlier preliminary injunction, the district court denied the government's request to stay the vacatur of the rule. *Id.* The Seventh Circuit, perhaps more experienced at reading the Supreme Court, stepped in and stayed implementation of the district court's judgment pending appeal. Order Granting Motion to Stay Judgment, *Cook County v. Wolf*, No. 20-3150 (7th Cir. Nov. 19, 2020), ECF No. 21.

While all this was going on, the federal government filed multiple petitions for certiorari seeking Supreme Court review of the Second, Seventh, and Ninth Circuit decisions concluding that the rule was likely unlawful. As these petitions were pending, President Biden took office in January 2021. Almost exactly a month later, the Supreme Court on February 22, 2021 granted review of the Second Circuit's case. *See Dep't of Homeland Sec. v. New York*, No. 20-449, 2021 WL 666376, at *1 (U.S. Feb. 22, 2021). While obviously one can never fully predict how the Supreme Court is going to decide a case, the Supreme Court's earlier stays—combined with its later cert grant of a lower court decision at odds with those stays—did not bode well for opponents of the rule.

### D.  DHS's Rapid Dismissal of the Litigation

One of those opponents was the new Biden Administration, which put the federal government in the awkward position of having a case teed up before the Supreme Court that it knew it was likely to win, but now really wanted to lose.  So in the early hours of March 9, 2021, despite the Supreme Court having granted certiorari just two weeks prior in a related case that the government had asked the Court to review, DHS in coordination with the plaintiffs moved to dismiss the Seventh Circuit appeal of the district court's vacatur of the rule.[3]  Approximately an hour and a half later, DHS released a statement explaining that "the Department of Justice will no longer pursue appellate review of judicial decisions invalidating or enjoining enforcement of the 2019 Rule."[4]  With a reaction time the envy of every appellate court, the Seventh Circuit only a few hours after DHS's statement granted the motion to dismiss and immediately issued the mandate.[5]  Later that same evening, DHS issued another statement noting that "[f]ollowing the Seventh Circuit dismissal this afternoon, the final judgment from the Northern District of Illinois, which vacated the 2019 public charge rule, went into effect."  It continued that "[a]s a result, the 1999 interim field guidance on the public

---

[3] *See* Unopposed Motion to Voluntarily Dismiss Appeal, *Cook County v. Wolf*, No. 20-3150 (7th Cir. Mar. 9, 2021), ECF No. 23.

[4] Press Release, U.S. Dep't of Homeland Sec., DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility (Mar. 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-statement-litigation-related-public-charge-ground-inadmissibility.

[5] Order Dismissing Appeal, *Cook County v. Wolf*, No. 20-3150 (7th Cir. Mar. 9, 2021), ECF No. 24-1; Notice of Issuance of Mandate, *Cook County v. Wolf*, No. 20-3150 (7th Cir. Mar. 9, 2021), ECF No. 24-2.

charge inadmissibility provision (i.e., the [Clinton-era] policy that was in place before the 2019 public charge rule) is now in effect."[6] A little over 24 hours later, the parties filed a joint stipulation to dismiss the case in the Northern District of Illinois.[7] The district court closed the case the following day.[8]

On the same day it dismissed its Seventh Circuit appeal, the federal government, now BFFs with its prior opponents, also filed joint stipulations to dismiss all the cases pending before the Supreme Court, including the Second Circuit case in which the Supreme Court had already granted cert.[9] Consistent with the Supreme Court's Rule 46.1, which allows automatic dismissal of a case by unanimous agreement of the parties, the Clerk of the Supreme Court, "without further reference to the Court," dismissed those cases. Sup. Ct. R 46.1.[10]

---

[6] Press Release, U.S. Dep't of Homeland Sec., DHS Secretary Statement on the 2019 Public Charge Rule (Mar. 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule.

[7] Joint Stipulation of Dismissal with Prejudice, *Cook County v. Wolf*, No. 19-cv-6334 (N.D. Ill. Mar. 11, 2019), ECF No. 253.

[8] Notification of Docket Entry, *Cook County v. Wolf*, No. 19-cv-6334 (N.D. Ill. Mar. 12, 2019), ECF No. 254.

[9] Joint Stipulation to Dismiss, *U.S. Dep't of Homeland Sec. v. New York*, No. 20-449 (U.S. Mar. 9, 2021); Joint Stipulation to Dismiss, *Mayorkas v. Cook County*, No. 20-450 (U.S. Mar. 9, 2021); Joint Stipulation to Dismiss, *USCIS v. City & County of San Francisco*, No. 20-962 (U.S. Mar. 9, 2021).

[10] *Mayorkas v. Cook County*, No. 20-450, 2021 WL 1081063 (U.S. Mar. 9, 2021); *USCIS v. City & County of San Francisco*, No. 20-962,

In the afternoon of that same day, March 9, 2021, the parties also moved to dismiss their case in the Fourth Circuit.[11]  The Fourth Circuit granted the unopposed motion and issued the mandate two days later, on March 11, 2021, noting the lack of opposition.[12]

On that same day—March 11, 2021, only two days after the federal government's volte-face—fourteen states[13] responded in the Seventh and Fourth Circuits to the parties' synchronized blitzkrieg, collectively filing a Motion to Recall the Mandate to Permit Intervention as Appellant, an Opposed Motion to Reconsider, or alternatively, Rehear, a Motion to Dismiss, and an Opposed Motion to Intervene.[14]

---

2021 WL 1081068 (U.S. Mar. 9, 2021); *Dep't of Homeland Sec. v. New York*, No. 20-449, 2021 WL 1081216 (U.S. Mar. 9, 2021).

[11] *See* Unopposed Motion to Voluntarily Dismiss Appeal, *CASA de Md. v. Biden*, No. 19-2222 (4th Cir. Mar. 9, 2021), ECF No. 210.

[12] *See* Order, *CASA de Md. v. Biden*, No. 19-2222 (4th Cir. Mar. 11, 2021), ECF No. 211; Rule 42(b) Mandate, *CASA de Md. v. Biden*, No. 19-2222 (4th Cir. Mar. 11, 2021), ECF No. 212.

[13] The states are Texas, Alabama, Arizona, Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Ohio, Oklahoma, South Carolina, and West Virginia.  The day before, on March 10, 2021, the states of Arizona, Alabama, Arkansas, Indiana, Kansas, Louisiana, Mississippi, Montana, Oklahoma, Texas, and West Virginia, filed the Motion to Intervene now denied by this panel.  *See* Motion to Intervene, *City and County of San Francisco v. USCIS*, Nos. 19-17213, 19-17214, 19-35914 (9th Cir. Mar. 10, 2021).   South Carolina and Missouri subsequently moved to join the motion before our court.

[14] *See* Motion to Recall the Mandate to Permit Intervention as Appellant, Opposed Motion to Reconsider, or in the Alternative to Rehear, the Motion to Dismiss, Opposed Motion to Intervene-Appellants, *Cook County v. Wolf*, No. 20-3150, (7th Cir. Mar. 11, 2021),

The states explained that "[b]ecause the Court issued its mandate within hours of the United States' announcement that it would no longer defend the Rule, interested parties had no ability to intervene before it did so," and "because the United States did not inform the States that it intended to cease defending the Rule before abandoning numerous cases supporting the Rule nationwide, the States did not have an opportunity to intervene at an earlier point."[15]

The Seventh Circuit summarily denied the states' motions on March 15, 2021,[16] coincidentally the same day that DHS issued a final rule removing the 2019 rule. The Fourth Circuit also summarily denied the states' motions on March 18, 2021.[17] On March 19, 2021, having been denied intervention or any other relief by the Seventh Circuit, the states asked the Supreme Court to order intervention or grant

---

ECF Nos. 25-1, 25-2, 25-3; Motion to Recall the Mandate to Permit Intervention as Appellant, Opposed Motion to Reconsider, or in the Alternative to Rehear, the Motion to Dismiss, Opposed Motion for Leave to Intervene-Appellants, *CASA de Md. v. Biden*, No. 19-2222 (4th Cir. Mar. 11, 2021), ECF Nos. 213, 214, 215.

[15] *See* Motion to Recall the Mandate to Permit Intervention as Appellant, *Cook County v. Wolf*, No. 20-3150, (7th Cir. Mar. 11, 2021), ECF Nos. 25-1, at 4.

[16] *See* Order Denying Motions, *Cook County v. Wolf*, No. 20-3150 (7th Cir. Mar. 15, 2021), ECF No. 26.

[17] *See* Order Denying Motions, *CASA de Md. v. Biden*, No. 19-2222 (4th Cir. Mar. 18, 2021), ECF No. 216.

alternative relief that would allow them to revive the lower court litigation.[18]

### E.  DHS's Rescission of the 2019 Rule

On March 15, 2021, DHS issued a final rule "remov[ing] the regulations resulting from [the 2019 rule], which has since been vacated by a Federal district court."[19]  Notably, it issued the final rule without a notice and comment period or delayed effective date, stating instead that it was promulgating a rule that was already in effect: "[t]his rule is effective on March 9, 2021, as a result of the district court's vacatur."  It explained that "[b]ecause this rule simply implements the district court's vacatur of the August 2019 rule, as a consequence of which the August 2019 rule no longer has any legal effect, DHS is not required to provide notice and comment or delay the effective date of this rule."  Accordingly, there was "good cause" to "bypass[] any otherwise applicable requirements of notice and comment and a delayed effective date" as "unnecessary for implementation of the court's order vacating the rule . . . in light of the agency's immediate need to implement the now-effective final judgment."[20]

This is the background against which we are presented the instant motion to intervene.  Arguing that the federal government managed to snatch defeat from the jaws of

---

[18] *See* Application for Leave to Intervene & for a Stay of Judgment, *Texas v. Cook County*, No. 20A150 (U.S. Mar. 19, 2021).

[19] Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221 (Mar. 15, 2021) (to be codified at 8 C.F.R. pts. 103, 106, 212–14, 245, 248).

[20] *Id.* at 14,221.

victory only by naked capitulation, the states ask for an opportunity to pick up the football and step into the federal government's shoes, just as the formerly adversarial parties are walking off the field together, hand-in-hand, celebrating their "win-win." Meanwhile, the plaintiffs and feds, only months ago bitter enemies, collectively press us to deny intervention. The game is over, they say. You can't put Humpty Dumpty back together again. The horse hasn't just left the barn—it's dead, and never coming back.

## II. Analysis

The federal government and the plaintiffs have certainly played their hand well. Not only have they gotten rid of a rule they dislike, but they've done so in a way that allowed them to dodge the pesky requirements of the APA *and* ensure that it will be very difficult for any future administration to promulgate another rule like the 2019 rule. But putting aside one's view of the merits of the rule itself, that doesn't seem like a good thing for good government. Leveraging a single judge's ruling into a mechanism to avoid the public participation in rule changes envisioned by the APA should trouble pretty much everyone, one would hope. Especially when the legal validity of that ruling is highly suspect and left untested only because of the collusive actions of the parties. Left unchecked, it seems quite likely this will become the mechanism of choice for future administrations to replace disfavored rules with prior favored ones.

But of course, just because something is bad policy doesn't always mean there is a legal basis to challenge it. Ultimately, the question currently before this panel is whether the states should be allowed to intervene—that is, not whether they should win the game, but just whether they should be allowed to play. That question is controlled by a

well-established standard that favors intervention. As explained below, I think the states have easily met that standard here.

## A.  The States Meet the Intervention Standard

The states' motion to intervene is governed by Federal Rule of Civil Procedure 24. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., AFL-CIO, Local 283 v. Scofield*, 382 U.S. 205, 217 n.10 (1965); *Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007). Per Rule 24(a)(2), applicants can intervene in an action as of right when they meet the following four requirements:

> (1) the intervention application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest.

*Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 24(a)(2). When determining whether these four "requirements are met, we normally follow 'practical and equitable considerations' and construe the Rule 'broadly in favor of proposed intervenors.'" *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (citation omitted).

To evaluate intervention's timeliness, "we consider (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the

reason for and length of the delay." *Peruta v. County of San Diego*, 824 F.3d 919, 940 (9th Cir. 2016) (en banc) (citation and internal quotation marks omitted). If a putative intervenor moves promptly to intervene when it becomes clear that their interests "would no longer be protected . . . there is no reason why [the intervention] should not be considered timely." *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394–95 (1977). The states here moved to intervene in the public charge cases within mere days of the federal government making public that it no longer sought to defend the rule. The plaintiffs and the federal government argue against intervention by contending that "[n]either practical nor equitable concerns justify intervention at this late stage in the litigation." But this is hardly the typical case where putative intervenors sat on their hands until the eleventh hour. Instead, the federal government robustly defended the rule for more than a year in courts across the nation before suddenly acquiescing in its vacatur and dismissing all the public charge cases without prior notice. Because the states quickly intervened when they discovered that the federal government had abandoned their interests, and the federal government has asserted no apparent prejudice in allowing intervention, the motion to intervene is timely.

The states also have a "significant protectable interest" in the continuing validity of the rule because invalidating the rule could cost the states as much as $1.01 billion annually.[21] The federal government contends that in lieu of joining this litigation, the states can vindicate their interests by participating in an agency review process or asking the

---

[21] Motion to Intervene by the States at 1, 3–5, *City & County of San Francisco v. USCIS*, 981 F.3d 742 (9th Cir. 2021) (Nos. 19-17213, 19-17214, 19-35914).

agency to promulgate a new rule.  This argument might have had more merit had the federal government followed the traditional route of asking the courts to hold the public charge cases in abeyance, rescinding the rule per the APA, and then promulgating a new rule through notice and comment rulemaking.  But instead, the federal government intentionally avoided the APA entirely by acquiescing in a final district court judgment and altering the federal regulations by unilaterally reinstating the 1999 field guidance.  *See* 86 Fed. Reg. at 14,221 ("This rule removes from the Code of Federal Regulations . . . the regulatory text that DHS promulgated in the August 2019 rule and restores the regulatory text to appear as it did prior to the issuance of the August 2019 rule.").  Its carefully coordinated actions effectively removed the Trump-era rule and installed the Clinton-era guidance as the de facto new rule—without any formal agency rulemaking or meaningful notice to the public.  By deliberately evading the administrative process in this way, the government harmed the state intervenors by preventing them from seeking any meaningful relief through agency channels.  The courts can and should remedy this procedural harm.  *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.").

The disposition of this action, together with the federal government's other coordinated efforts to eliminate the rule while avoiding APA review, will impair or impede the states' ability to protect their interest in the 2019 rule's estimated annual savings discussed above.  And the existing parties obviously do not adequately represent the states' interests because they are now united in vigorous *opposition*

to the rule. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) ("The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties.").

Against the states' arguments in favor of intervention, the federal government and plaintiffs have one main response: this case is moot because the court cannot offer adequate relief now that the 2019 rule has been vacated by a different federal judge in a different circuit.

"The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). "That burden is 'heavy'; a case is not moot where *any* effective relief may be granted." *Id.* (emphasis in original) (citation omitted).

The parties opposing intervention have failed to meet their "heavy" burden here. *Id.* (citation omitted). As the states explain, they could obtain effective relief because they currently have an action pending before the Supreme Court asking that Court to order the Seventh Circuit to reverse or stay the vacatur of the rule. If successful, that would remove any obstacle to the states ultimately getting relief in this court. *See Allied Concrete & Supply Co. v Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018) (distinguishing moot cases where the underlying litigation had concluded from cases where "a potential petition for rehearing or certiorari keeps a case alive"). Indeed, *if* the states are successful in their current request that the Supreme Court stay the Seventh Circuit's vacatur of the rule, given our denial of their intervention here the states will be left with no way to prevent one of the district courts in our circuit from immediately imposing a nationwide preliminary injunction of the rule or, worse, vacating the rule (again). The horse may have left the barn,

but the rumors of its death are, if not greatly exaggerated, at least premature.

Since this case is not moot, I would have granted the states' intervention motion because now that the federal government has abandoned the field, only the states themselves can present their arguments in favor of the rule to the Court. By denying the motion to intervene, we are sanctioning a collude-and-circumvent tactic by the parties, who clearly now share the same agenda. *Cf. Knox v. Serv. Emp. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (warning that "postcertiorari maneuvers designed to insulate a decision from review by [the Supreme] Court must be viewed with a critical eye").

There is a final reason why intervention is especially warranted in this case. By granting two stays (and a later petition for certiorari), the Supreme Court repeatedly indicated that the United States had "made a strong showing that [it was] likely to succeed on the merits" in its defense of the rule. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted). Absent intervention, the parties' strategic cooperative dismissals preclude those whose interests are no longer represented from pursuing arguments that the Supreme Court has already alluded are meritorious. Even more concerning, the dismissals lock in a final judgment and a handful of presumptively wrong appellate court decisions in multiple circuits, and circumvent the APA by avoiding formal notice-and-comment procedures. *See Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1180 (9th Cir. 2021) (noting that among "the most fundamental of the APA's procedural requirements" is the requirement that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views,

or arguments for the agency's consideration" (citation and internal quotation marks omitted)).   The United States' evasion of one of the APA's most fundamental requirements, especially on such shaky grounds as a district court decision that never withstood the crucible of full appellate review, further supports intervention here.

## B. *Munsingwear* Vacatur?

There is truth to the federal government's and plaintiffs' arguments in opposition to intervention that, as things currently stand, the Ninth Circuit's Public Charge cases have been relegated to little more than a rearguard action.  So long as the 2019 rule itself remains vacated nationwide by a single judge in the Seventh Circuit, not much can be done in this circuit to affect that.   While that doesn't technically make this case moot for purposes of our intervention analysis, it does highlight the expansive reach of the parties' coordinated actions, and how impressively effective those actions are at preventing anyone or any single court from unwinding their multifaceted, calculated capitulation and avoidance of the APA.   They really have smashed Humpty Dumpty into pieces spread across the nation, and there isn't a single court (or future administration) that can do much about it.

Except the one court that has yet to address the states' arguments: the Supreme Court.  First, the Supreme Court obviously could allow the states to intervene in the Seventh Circuit litigation and defend the 2019 rule in place of the federal government.  But I think there may be a simpler solution here that would not only address what has happened with respect to the Public Charge rule but, perhaps more importantly, would encourage future administrations to change rules—not through collusive capitulation—but via

the familiar and required APA rulemaking process Congress created for that purpose.

The solution is that the Supreme Court could simply clarify that *Munsingwear* vacatur of lower court decisions and judgments is appropriate in this circumstance where the federal government and the plaintiffs jointly mooted litigation by acquiescing in a judgment against the government, which then prevented the normal APA process for removing or replacing a formal rule. Under *Munsingwear*, when a civil case is mooted while on appeal to the Supreme Court, "[t]he established practice" is "to reverse or vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). "Because this practice is rooted in equity, the decision whether to vacate turns on 'the conditions and circumstances of the particular case.'" *Azar v. Garza*, 138 S. Ct. 1790, 1792 (2018) (per curiam) (citation omitted).

For instance, "[v]acatur is in order when mootness occurs through . . . the 'unilateral action of the party who prevailed in the lower court.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 71–72 (1997) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994)). This is to prevent a party from securing "a favorable judgment, tak[ing] voluntary action that moots the dispute, and then retain[ing] the benefit of the judgment." *Arizonans for Off. Eng.*, 520 U.S. at 75 (alterations omitted). By requiring that the lower court judgment be vacated under those circumstances, *Munsingwear* "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences." *Munsingwear*, 340 U.S. at 41. That's why vacatur in such circumstances is "generally 'automatic.'"

*NASD Dispute Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007) (citation omitted).

But under the *Bancorp* exception to *Munsingwear*, courts usually won't vacate lower court decisions when the *appellant's* voluntary actions moot the appeal. *See Bancorp*, 513 U.S. at 25. The reason for that is straightforward: generally, if a party lost below, but does something intentional to moot its case while the appeal is pending, you don't need to worry about that losing party deliberately mooting the case on appeal *so that* it can "retain the benefit of the judgment" without risking a future adverse decision. For the party that *lost* below, there isn't generally any "benefit of the judgment" to be retained. If the losing party voluntarily moots the case on appeal, it is invariably for some reason other than trying to manipulate the court system to lock in favorable precedent while insulating that precedent from further review. That is why, in reliance on *Bancorp*, courts rarely *Munsingwear* vacate a lower court decision when the parties voluntarily settle a case. *See generally id.* In those situations, "[t]he judgment is not unreviewable, but simply unreviewed by [the losing party's] own choice." *Id.* Those appellants "voluntarily forfeited [their] legal remedy by the ordinary process of appeal or certiorari, thereby surrendering [their] claim to the equitable remedy of vacatur." *Id.*

The federal government's coordinated settlement of the Public Charge cases falls within the technical parameters of the *Bancorp* exception to *Munsingwear* vacatur because the federal government was the appellant in these cases. But the uniquely inequitable circumstances facing the intervening states here, together with the government's maneuvering precisely so that it could retain the benefit of some questionable judgments it now really likes, demonstrates

that this situation clearly falls far outside any reasonable rationale for *Bancorp*'s exception to *Munsingwear*'s normal rule.  The settlements that the states seek to challenge are a transparent attempt by a new federal administration and its prior litigation opponents to not only rid the federal government of a now-disfavored rule, but also to avoid the APA's procedures in changing that rule *and* force any future administration that wants to enact a similar rule to fight against the strong headwinds of dubious Ninth, Seventh, and Second Circuit precedent.  This is, in short, precisely an example of a party "tak[ing] voluntary action that moots the dispute, and then retain[ing] the benefit of the judgment." *Arizonans for Off. Eng.*, 520 U.S. at 75 (alterations omitted).

Because both *Munsingwear* and *Bancorp* turn on equity—and even *Bancorp* notes that "exceptional circumstance[s] may . . . counsel in favor of . . . vacatur" when parties settle, *Bancorp*, 513 U.S. at 29—the Supreme Court should make clear that the *Bancorp* exception to *Munsingwear*, which usually counsels against vacating a judgment where the appellant's voluntary actions mooted the appeal, does *not* apply in this circumstance.  The states' proceedings before the Supreme Court seem like a perfect vehicle for the Court to address this unique situation where a new administration doesn't like a duly enacted rule and attempts to insulate the lower court's judgment vacating the disfavored rule from further appellate review.

Clarifying that all lower court decisions and judgments should be vacated under these circumstances would have both immediate and long-term salutary effects.  First, the current administration will be required to do what every administration before it did with existing rules they didn't like—promulgate a new rule subject to all of the procedural protections provided by the APA.  Second, the thicket of

suspect lower-court precedents created by the Public Charge litigation, which the Supreme Court seemed poised to correct before the parties' voluntary dismissal, would be cleared away instead of remaining as a calcified obstacle to future executive discretion. And third, future administrations (and courts, and challengers) will be incentivized to follow the APA's rules, rather than attempt procedural workarounds that eliminate the public's participation in administrative rulemaking.[22]

Our court should have allowed the states to intervene in these suits. But one hopes that maybe our incorrect denial of intervention may be as inconsequential as the panel majority's prior incorrect opinion, once the Supreme Court makes clear that our dirty slate must be wiped clean under *Munsingwear*—and with it, all its inequitable repercussions.

---

[22] There is one additional reason why *Munsingwear* vacatur of the lower courts' decisions would be particularly appropriate in the context of the Public Charge rule. By design, the federal government's and plaintiffs' coordinated dismissals act to replace the Trump Administration's Public Charge rule with the Clinton Administration's Public Charge "guidance." Press Release, U.S. Dep't of Homeland Sec., DHS Secretary Statement on the 2019 Public Charge Rule (Mar. 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-secretary-statement-2019-public-charge-rule. As discussed, under the Clinton-era guidance, a noncitizen who is *entirely* dependent on in kind government support—for food, housing, medical care, etc.—cannot be considered a "public charge" unless he also receives cash benefits. That seems like it might run into problems under the APA. But the government's circumvention of the APA allowed it to slip back into applying the old guidance without even needing to take that into consideration.